## Case No. 11,185.

### PITMAN v. HOOPER.

[3 Sumn. 50.] 1

Circuit Court, D. Massachusetts. Oct. Term, 1837.

SEAMEN'S WAGES—CONDEMNATION — INDEMNITY— PRO RATA DEDUCTION FROM WAGES — PRIORITY OF CLAIMS—FREIGHT—EFFECT OF CONTRACT BETWEEN OWNER AND SHIPPER.

1. The libellant shipped in June, 1809, as a seaman, on a voyage from Marblehead to St. Petersburg, and thence back to the United States; the outward cargo was duly delivered; a return cargo to the same amount was taken on board; and the ship sailed in June, 1810, on her homeward voyage, in the course of which she was captured by some Danish gun-brigs, and afterwards condemned. The libellant continued on board the ship until her condemnation, when he was discharged. Under the treaty between the United States and the king of Denmark, of the 28th March, 1830, providing a certain sum in full for compensation for services, detentions, and condemnations by the king of Denmark, the respondent, administrator of the owner of the ship and cargo, received $19,115, in full for his proportion of the indemnity granted, being about one third of his loss ($61,416). Held, that the libellant was entitled to recover of the respondent full wages, and not simply a pro rata proportion, according to the amount received by the ship-owner. And this, though the commissioners under the treaty made no express allowance on account of freight. Semble, that this would be so, even if they had expressly rejected the claim for freight.

[Cited in Nevitt v. Clarke, Case No. 10,138; The John Perkins, Id. 7,360.]

[Cited in brief in Benner v. Equitable Ins. Co., 88 Mass. 223.]

2. The claim for seamen's wages takes precedence of bottomry bonds and all other claims, whether the entirety of the fund, out of which they are to be paid, remains, or a part of it is lost by accident or otherwise.

[Cited in The Dawn, Case No. 3,666; The Niphon's Crew, Id. 10,277; Skolfield v. Potter, Id. 12,925; The George Prescott, Id. 5,339.]

[Cited in Eddy v. O'Hara, 132 Mass. 58.]

1 [Reported by Charles Sumner, Esq.]

3. If freight is earned by the voyage, whether greater or less, and whether actually received by the owner or not, the right of the seaman to his wages accrues, to the full extent of the freight earned.

[Cited in Joy v. Allen, Case No. 7,552; The Massasoit, Id. 9,260; The Niphon's Crew, Id. 10,277.]

4. The seaman's wages are nailed to the last plank of the ship; so also to the last fragment of the freight.

[Cited in The Dawn, Case No. 3,666.]

5. The right of the seaman to his wages is not affected, either for good or for evil, by any private contract between the ship-owner and the shippers, with regard to freight.

[See The Erie, Case No. 4,512.]

6. Semble, where freight is paid in advance and the voyage is not performed, the ship-owner cannot without an express stipulation to this effect, retain it; but the shipper may recover it back.

[Cited in The Zenobia, Case No. 18,208; The Bird of Paradise, 5 Wall. (72 U. S.) 562. Cited in brief in Fleishman v. The John P. Best, Case No. 4,861.]

[Cited in Ogden v. New York Mut. Ins. Co., 35 N. Y. 420; Brown v. Harris, 68 Mass. 360.]

[Appeal from the district court of the United States for the district of Massachusetts.]

Libel for mariner's wages. The libel in substance stated as follows: "That in the month of June, A. D. eighteen hundred and nine, the brig Polly, whereof the said Robert Hooper, deceased, was then the owner, and whereof Ebenezer Graves, of Marblehead aforesaid, was master, being at the said port of Marblehead, and destined on a voyage from thence to St. Petersburg, in Russia, and thence back to the United States, he, the said Robert Hooper, deceased, by himself or his agent, on the high seas and within the ebb and flow of the tide, and within the admiralty and maritime jurisdiction of the United States and of this honorable court, did ship and hire the libellant [John Pitman] to serve as a mariner on board the said brig Polly for and during said voyage at the rate of wages of twenty dollars per month, as per schedulate; and that for the due performance of said voyage, the libellant signed and duly executed certain articles of agreement, commonly called the shipper's articles, which now are in the possession of the said administrator, and which he prays may be produced for farther certainty in the premises, and for the benefit of the libellant. That in pursuance thereof, on or about the nineteenth day of June, A. D. eighteen hundred and nine, he, the libellant, went on board and entered into the service of said brig as such mariner as aforesaid. That the said brig, having taken on board a cargo of divers goods and merchandise for the voyage, proceeded thence with the libellant on board, for the said port of St. Petersburg, and there safely arrived some time in the month of October, in the year last aforesaid, and delivered her cargo and made freight. That the said brig, with the libellant on board, sailed from the said port of St. Petersburg some time in the month of June, A. D. eighteen hundred

and ten, destined for the said port of Marblehead. That the said brig, while on her passage to the said port of Marblehead, in the month of July, in the year last aforesaid, was captured by five Danish gun-brigs, and sent into Christiansand, in the kingdom of Denmark, where she was libelled and condemned as prize in the lower prize court of that kingdom. That the libellant continued on board and in the service of said brig until the condemnation aforesaid, when he was discharged from such service by the said master, and took passage for the said port of Marblehead, in the ship America, where he arrived on the fifteenth day of November, A. D. eighteen hundred and ten. That during the whole time he was in the service of the said brig, to wit, from the time he went on board thereof to the time of his discharge therefrom as aforesaid, he well and truly performed his duty as a mariner on board the said brig, according to his best ability, and was obedient to all the lawful commands of the said master and other officers of the said brig, and well and truly deserved and is entitled to wages amounting to the sum of two hundred and sixty-eight dollars. Your libellant further alleges and propounds, that by an award of commissioners, duly appointed to carry into effect the convention between the United States of America and his majesty the king of Denmark, concluded at Copenhagen on the twenty-eighth day of March, A. D. eighteen hundred and thirty, the said Robert Hooper, in his said capacity of administrator as aforesaid, did receive on account of the capture and condemnation of said brig Polly and cargo, the sum of twenty thousand three hundred eighty-one dollars, and sixty-four cents."

The answer of the respondent acknowledged that he was the administrator of Robert Hooper, deceased; and that on the 15th June, 1809, the libellant shipped on board the brig Polly; that the brig performed her voyage to St. Petersburg and then delivered her outward cargo, and on or about May 1st, 1810, sailed from St. Petersburg for Marblehead. The answer continued as follows: "That the said brig was captured, libelled and condemned, as is stated in said libel, and that the said libellant returned to the United States, but whether he did any and what duty on board of the said brig after her capture, or when he was discharged from the said brig, or when he arrived in the United States, this respondent does not know and cannot set forth, but leaves the said libellant to prove the same, if material. That this respondent believes that the libellant while on board the said brig, did his duty as a mariner, but he denies that he is now entitled to the wages claimed by him. That before the departure of the said brig for sea, and during the course of the said voyage, various sums of money were advanced and paid either to the libellant or to Elizabeth Pitman, his mother and guardian, and after the return of the libellant to the United States, the said intestate and the said Elizabeth Pit-

man, accounted together of and concerning the wages of the said son, who was then a minor under the age of twenty-one years, and upon such accounting, the said intestate paid to the said Elizabeth Pitman, a balance of thirty-one dollars 41-100, which was the whole sum justly due for the wages of the said libellant, and took the receipt of the said Elizabeth in full discharge. And this respondent further says that from the lapse of time, and from the decease of said intestate, he is unable to exhibit plenary proof of the particular sums advanced and paid from time to time to the said libellant and the said Elizabeth, but he produces herewith an original account in the handwriting of the said intestate, and found by this respondent among the papers of the intestate, which relates to the said voyage, which account contains a statement of the various sums paid to the seamen who were of the crew of the said brig in the said voyage, to the said libellant or his representative among others, and this respondent verily believes that it is an original and correct account thereof. This respondent denies that, by the award of the commissioners named in said libel, he received, on account of the condemnation and confiscation of the said brig and her cargo, the sum named in said libel, but on the contrary this respondent avers that the value of the said brig, without freight, and the invoice cost of the cargo which was on board at the time of her capture and condemnation, were by the said commissioners adjudged to be sixty-one thousand four hundred and sixteen dollars; that in point of fact the just and true value thereof was a larger sum, that is to say, sixty-five thousand dollars and upwards, as will appear by the statement hereto annexed, marked 'A.' That the amount of money received by the United States of America under the said treaty was far less than sufficient to pay the full amount of all the claims thereon which were allowed by the said commissioners, and were only sufficient to pay thirty-one per centum of the said claims, and, pursuant to the said award of the said commissioners, there was allowed to this respondent, as administrator as aforesaid, the sum of nineteen thousand one hundred and fifteen dollars 73-100, being about thirty-one per centum of the invoice value of the said cargo and of the value of the said brig, without including freight or profits; and this respondent denies that any freight, or damages by way of freight or profits, or increased value of vessel or merchandise, was in any way allowed to or received by this respondent. And this respondent was obliged to and did incur large expenses to procure the allowance and award aforesaid, that is to say, this respondent did allow and pay to his agent employed and retained to prosecute the said claims, six per centum upon the whole amount recovered and received by this respondent; and this respondent was also subjected to other expenses by reason of journeys, preparing documents, and other causes, amounting

to the sum of two hundred dollars, or thereabouts. And this respondent denies that the said libellant is justly entitled to any part of the wages claimed by him, inasmuch as no freight was allowed to or received by the said respondent, and this respondent denies that the said libellant is justly entitled to receive any part of the sums allowed to and received by this respondent as and for thirty-one per centum of the cost of the cargo, and the value of the brig Polly aforesaid."

The district court made a pro forma decree in favor of the libellant [case unreported], upon which an appeal was taken to the circuit court; and the following reasons of appeal were filed: I. For that by the said decree, the wages of the said libellant for the whole voyage are allowed, and decreed to him, deducting only the advances therefore made to him, as alleged in his said libel, whereas there should have been deducted from any allowance made to him, a much larger sum, that is to say, the sum of one hundred and forty dollars, being the amount of advances actually made to him. II. For that wages were allowed to the libellant for the whole voyage, whereas there should have been no wages allowed to him for any time before the expiration of one half the time while the said brig remained at St. Petersburg. III. For that the full wages of the libellant were allowed to him, whereas if any thing, only thirty-one per centum of such wages should have been allowed. IV. For that no deduction from the said wages was made on account of expenses incurred by the respondent in recovering and obtaining the partial indemnity aforesaid. V. For that wages or compensation were allowed to the libellant by reason of the partial indemnity aforesaid, although no freight, or damages by way of freight or profits, or increased value of vessel or cargo, was allowed to the respondent under the treaty aforesaid.

J. Pickering, for libellant.
B. R. Curtis, for respondent.

STORY, Circuit Justice. The libellant, in June, 1809, shipped on board the brig Polly, owned by the intestate Robert Hooper, on a voyage from Marblehead, in this district, to St. Petersburg, in Russia, and thence back to the United States. The brig sailed on the voyage with a cargo belonging to the intestate, and arrived at St. Petersburg, and there safely delivered her cargo. A return cargo on the same account was taken on board, and the brig sailed on the homeward voyage in June, 1810, and in the course of the voyage was captured by some Danish gun-brigs, carried into Christiansand, in Denmark, and there condemned. The libellant continued on board of the brig until her condemnation, and then was discharged and took passage in an American ship and arrived at Marblehead in November, 1810.

By the treaty between the United States and the king of Denmark, made at Copenhagen on the 28th of March, 1830, the sum of $650,000 was agreed to be paid by the king of Denmark on account of claims of the citizens of the United States for seizures, detentions, and condemnations or confiscations of their vessels and other property, to be distributed by a board of commissioners, appointed in the manner pointed out in the treaty. The sum thus agreed to be paid fell far short of the amount claimed before the commissioners under the treaty. By the final award of the commissioners in 1833, they allowed to the respondent, as administrator, on account of the capture of the brig Polly and her cargo, the sum of $61,416 as his loss, and awarded him as his proportion of the indemnity granted by the treaty, payable on reduction (to use their own phrase) the sum of $19,115.73, a little short of one third of the amount lost. In the amount allowed to the respondent, no notice whatsoever is taken of freight. Nor was it necessary; because the intestate, being sole owner of the brig and cargo, freight could not constitute a distinct item of loss; but would naturally and properly be included in the estimated value of the ship and cargo. And in cases of this sort, the award must be presumed to include all proper allowances to the owner; and it will be conclusive on that point, unless, on the face of the award itself, the contrary expressly appears. Indeed, if it had appeared on the face of the award, that no freight had been allowed, and that the claim had been expressly rejected, it would be far from certain, that that rejection would necessarily affect the title to wages; because the natural presumption would be, omnia rite acta, that the rejection was founded on objections personal to the owner, or his acts; in no respect touching the rights of the seamen. At least it must be a very strong case, which would justify a different conclusion. We may, therefore, lay out of the case all further consideration of the question, whether freight has been awarded, as, indeed, upon the intimation of the court, it was waived at the argument.

The real, and indeed the only point, raised at the argument, is, whether the libellant is entitled to receive his full wages for the homeward voyage, or whether there is a reduction to be made of the wages in the same proportion (about two thirds), as the owner himself has been compelled to submit to under the award. That question depends upon this, whether the wages of the seamen constitute, in cases of this sort, a privileged claim to their full amount, or only pro rata, on the sum received by the owner. There is no doubt, that, to the full extent of the wages actually due by the owner to the seamen, the wages constitute a lien, or privilege on the sum received by him prior to all other claims. This is clear upon authority and principle. The seamen's wages generally constitute a lien, or claim upon the ship and freight, and upon the proceeds thereof, in whatever hands

they may be, which must be paid before any other claims. It has been significantly said, that they are nailed to the last plank of the ship: a figurative expression, which will be found used in one of the earliest maritime codes in modern times (the Consolato del Mare) of which we have any distinct traces. Pard. Collect. des Lois Mar. tom. 2, p. 129; Consol. del Mare, c. 93 (138). And it may be added, that they adhere also to the last fragment of the freight. The case of Sheppard v. Taylor, 5 Pet. [30 U. S.] 675, 710, fully supports this doctrine. It was recognized by this court in the case of Brown v. Lull [Case No. 2,018]. See, also, Sir Leoline Jenkins' argument before the house or lords. 6 Hall, Law J. 566. But the true question in the present case is not as to this privilege or priority of wages over all other claims, but as to the amount really due as wages from the owners in the present case, for which this privilege or priority is to take effect. When the question was first presented to my mind, I am free to confess that my impression was, that the wages must be reduced pro rata with the claim of the owners, received under the award of the commissioners. The case was confessedly novel in its actual presentation. The fund received by the claimant may justly be considered as a sort of trust fund in his hands for the discharge of all the claims of all parties interested therein. Under such circumstances, if the trust fund is inadequate to discharge the claims of all who are interested therein, the question naturally presented is, whether all shall partake pro rata. If a part of the trust fund had perished, that would be the ordinary course of distribution among all the claimants; for in such case, "Res perit domino." But this supposes an equality of right in all the claimants, and the absence of any priority or privilege of payment of some before others. In such a case, the priority or privilege would seem to attach to the residue, as it did to the original fund; that is, he will be first to be entitled to be paid in full, who has originally that right, before the others are to receive anything. This is the ordinary rule in regard to several bottomry bonds, where the funds are inadequate to the discharge of all. And in cases of bottomry bonds, conflicting with maritime wages from the deficiency of the fund, the wages have a priority of payment out of the fund, without any distinction, whether the entirety of the fund remains, or a part of it is lost by accident or otherwise. The general principle is well stated and fully recognised in the learned Commentaries of Mr. Chancellor Kent, with equal brevity and clearness,—3 Kent, Comm. (3d Ed.) lecture 46, pp. 196, 197,—and it was judicially expounded and acted on by Lord Stowell in the case of The Madonna D'Idra, 1 Dod. 37, 40, The Sidney Cove, 2 Dod. 1, 13, and The Kanmerhevie Rosenkrants, 1 Hagg. Adm. 62: and by the supreme court of the United States in the case of The Virgin, 8 Pet. [33 U. S.] 538.

The wages of seamen constitute, as has been justly remarked at the argument, a peculiar class of contracts; and the principles, applicable to them, do not belong to the ordinary contracts for hire and services. In ordinary contracts for hire and services, the persons employed do not partake af any of the risks of the owner in relation to the property. They are entitled to their full compensation for labor and services on the property, although it shall be utterly lost or destroyed by accident or superior force. Not so with the contracts of seamen for maritime voyages and adventures. The policy of the maritime law has in such cases subjected them to the risks of the voyage to a limited extent: for the payment of wages is ordinarily made to depend upon the earning of freight in the voyage. If freight is not earned in the voyage, in consequence of an overwhelming calamity, or an unexpected accident, the seamen generally lose their wages. But if freight is earned in the voyage, and for the voyage, whether it is greater or less, and whether it is actually secured by the owner or not, makes no difference in the rights of the seamen. The general doctrine will be found well laid down in Lord Tenterden's treatise on Shipping (page 447, and note 2 to the last American edition); and in Mr. Chancellor Kent's Commentaries (volume 3 [3d Ed.] pp. 187-194). There are exceptions, however, to the general rule, some of which will be here stated, because they bear directly upon the point in discussion. In the case of a shipwreck during the voyage, the seamen, if they remain by the ship and assist in the salvage, will be entitled to receive their wages out of the fragments of the wreck, if enough is saved to pay them, even though the entire freight be lost by the total destruction and loss of the cargo. This exception is doubtless designed to enlist the zeal and exertions of the seamen in the preservation of the property as far as possible; and it is founded upon the same policy as the general rule; that is to say, to make it their interest to use every endeavor to save the property, and to promote the success of the voyage. Whether this exception is to be expounded upon the ground of its being an allowance to the seamen in the nature of salvage, or whether it is a mere dry exception to enforce the public policy of the original rule, has been a topic of some judicial discussion. But whether it stands upon the one ground or the other, it is an exception now firmly established. It was fully recognized by Lord Stowell in the case of The Neptune, 1 Hagg. Adm. 227, and by this court at an earlier period in the case of The two Catherines [Case No. 14,288]. What I rely on, in regard to this exception, is, that it establishes a case, in which, though the entire freight is lost, the seamen recover their full wages out of the wreck of the ship, without any deduction pro rata on account of the value of the materials of the ship, which have perished.

The entire wages constitute in this case a privileged lien to be first paid; and the owner must submit to the entire loss, without any contribution towards his own loss. Then, again, in the case of a general average in the course of a voyage, the wages of seamen do not contribute to the loss, though the ship, cargo, and freight, all do, and though thereby a part of the freight for the voyage is necessarily lost. In such a case it is plain, that the loss of freight does not entitle the owner to make a pro rata deduction of the wages. And here, again, there is an exception of the case of ransom, and, perhaps, also of the analogous case of recapture; in which the wages of seamen do contribute. This exception, also, is founded upon the public policy of offering a strong inducement to the seamen to stand by and defend the ship against hostile and piratical attacks; and was probably borrowed from the Roman law, in which all the jurists seemed to concur, that contribution by all interested should be made in such a case. "Si navis a piratis redempta sit, Servius, Offilius, et Labeo omnes contribuere debere aiunt." Dig. lib. 14, tit. 2, l. 2, § 3 ; 1 Valin, Comm. lib. 3, p. 752, tit. 4, art. 20. I need not do more upon this point than to refer to Lord Tenterden's treatise on Shipping (Abb. Shipp. pt. 3, p. 357, c. 8, § 14, and part 4, p. 458, c. 3, § 1), and Marshall on Insurance (book 1, p. 544, c. 2, § 7). See, also, cases in the American courts, cited in Abb. Shipp. (Boston Ed. 1829) 444, note 2; The Saratoga [Case No. 12,355].

Cases of salvage are of a kindred nature; and in no instance within my recollection, except of a recapture, has it ever been contended, that the seamen's wages were to contribute towards the salvage. Yet a decree of salvage may occasion a loss of a moiety of the value of ship, cargo, and incidentally of the freight also. Now, I cannot but think, that, if any rule had been established, that, in cases of freight partially lost or diminished in the course of the voyage by maritime accidents or perils, a deduction is to be made pro rata from the seamen's wages, there must have been some clear and decisive evidence of the existence of the rule, either by judicial decisions, or by settled usages, considering that a vast variety of cases must have arisen to which it was applicable, many of which must have undergone a full consideration in courts of justice. The total silence of the books, under such circumstances, is peculiarly expressive; and the total absence of any known and fixed usage affords no mean corroborative proof that there is no such rule. It is this consideration, that, upon further reflection, has greatly shaken my confidence in the original opinion which I entertained upon the subject. Let us put a case of very common occurrence, where, in the course of the voyage, there has been a partial loss of cargo by a peril of the seas. In such a case, has there ever been a reduction of the seamen's wages,

when the remaining freight has been more than sufficient to pay the entire wages due on the voyage, and the voyage has been completely performed? If there has not been, then it would be difficult to show any ground, upon which any deduction can be properly made in the present case; for, at most, it amounts but to a partial loss of the cargo and freight during the voyage. No case can be found, as I believe, in which any such deduction has been recognized by any court of justice; and no general usage by the custom of merchants, allowing the deduction, has been referred to at the argument, or has been asserted to exist. What, then, is the proper conclusion to be drawn from this universal silence in our courts of justice, and in the maritime adjustments of wages? Certainly, it would seem to be, that the maritime law has never been supposed to authorize any such deduction, since the occasion to apply it must have been of almost daily occurrence in our own extensive navigation, as well as that of the commercial nations of Europe. I have made some researches into the jurisprudence of the most commercial of the nations of continental Europe; and though these researches have not led me to a very definite and positive result, yet, as far as I have been able to ascertain, no such rule of deduction is any where known to exist; and the presumptions from the doctrines in other cases seem all the other way.

In cases of general average, it seems generally held, that the seamen's wages do not contribute, except in the case of ransom. This is positively stated in the ordinance of Louis XIV. (article 20) on this subject (1 Valin, Comm. lib. 3, p. 752, tit. 4, art. 20), Jac. Sea Laws, p. 155, as the law of France; and this seems the general rule adopted in the maritime states of the continent. In cases of shipwreck the seamen are entitled to be paid their full wages out of the remains of the ship; and if they are insufficient, then out of the freight of the cargo which has been saved. The language of the ordinance of Louis XIV. (article 9) on this subject, seems to be somewhat equivocal; and would seem, at first view, to point, not to the full wages, but only to pro rata wages, in proportion to the freight received. "S'il n'y a que des merchandisés sauvees, les matelots, meme ceux engagés au fret, seront payés de leurs loyers par le maitre à proportion du fret, qu'il recevra." But Valin manifestly understands this to mean, that they shall be paid their full wages out of the freight for the part of the voyage performed, as far as the freight will go. 1 Valin, Comm. lib. 3, p. 703, tit. 4, art. 9.[2] And Pothier adopts the same doctrine; for, commenting on the article, he says: "The mariners, as well those, who are hired by the voyage, as those, who

----

[2] See Stev. & B. Average (by Phillips) 218, 251; 1 Emerig. Assur. (Ed. Boulay Paty, 1827) pp. 624, 625, c. 12, art. 7, § 42.

are hired by the month, may pay themselves out of the freight (se venger du fret) for their lost wages, and they may entirely exhaust the freight for the payment of their wages. But those who are hired by the freight (that is, those who are to have a part of the freight in lieu of wages) can only claim from the freight the part which they ought to have according to their agreement." Poth. Traité du Louage des Matelots, art. 186. And in case of shipwreck, it is very clear that the same ordinance allows a freight pro rata only on the cargo saved; as, indeed, was the rule in the Consolato del Mare. 1 Valin, Comm. lib. 3, pp. 664, 665, tit. 3, arts. 21, 22; Consolato del Mare (Pardessus' Ed.) c. 101 (196). Now, I think that it can scarcely be doubted, that this ordinance embodies, in general, the principles of maritime law recognized at the time when it was promulgated. The modern French code seems to have recognized the same rule; and its commentators have adopted a similar interpretation. Code de Commerce, art. 259. See Sautayra Code de Commerce, Expliqué, p. 170. If, in cases of shipwreck, the seamen's wages are not to abate in proportion to the diminution of freight, there would seem to be but little reason to suppose that they were liable to a deduction pro rata in case of loss of a part of the freight from any other accident in the voyage. I have not been able to find that any such case is specially provided for, in that or in any other ordinance of any commercial nation. There are one or two passages in the Consolato del Mare, which speak of the mariner's wages being diminished in proportion to the diminution of freight; but they furnish no general rule in a case like the present. One of them is a case of a voluntary allowance by the master to the shipper of a part of the freight, where it is said that the seamen's wages should also abate in proportion; a doctrine hardly tenable at this day. Consolato del Mare (Pardessus' Ed.) c. 59 (104) p. 108. See, also, Id. p. 131, c. 95 (140).

The only case bearing upon this subject in English jurisprudence, which has been cited at the bar, is the anonymous case in 2 Show. 291 (283), where it is asserted to have been held at nisi prius by Lord Chief Justice Saunders, that freight is the mother of wages; and wheresoever freight is due, wages are also; and that advance money, paid before, if in part for freight, and named so in the charter party, although the ship be lost before it come to a delivering port, yet the wages are due according to the proportion of the freight paid before; for the freighters cannot have their money. This report is at best very loose, and without any special statement of the facts, which would enable us to say, whether the language attributed to the lord chief justice was a mere dictum, or involved the point directly in judgment. It was held, too, at a time, when the principles of commencial law were very little under-

stood in the courts of England; and it is not very easy to reconcile it with strict principle. The peculiar contract between the ship-owner and the shippers in regard to freight has in general nothing to do with the rights of the seamen to their wages. Their rights stand upon the general grounds of maritime law. If freight could be earned by the common principles of that law in a given case—if there was no precise, express contract, variant from that law—the seamen would be entitled to their wages, notwithstanding the owner had stipulated for his freight upon other contingencies, and under very different circumstances. Abb. Shipp. pt. 4, pp, 447, 448, c. 2, § 4. In short, his private contract respecting freight will not vary theirs respecting wages. If he were to stipulate for freight only upon the successful termination of the homeward voyage, they would still be entitled to wages for the outward voyage, if successfully performed, notwithstanding the ship were lost on the homeward voyage. Upon the same ground, if he were to stipulate for an advance of freight, not to be repaid, whether the voyage were performed or not, that would seem equally to be a matter with which the seamen have no concern; for their title would seem to depend upon the common right to freight earned by the due performance of the voyage. Besides, in the ordinary cases of freight paid in advance, I do not understand that, if the voyage is not performed, the owner can, without an express stipulation to the purpose, retain it; but the shipper is entitled to recover it back.[3] This is certainly the doctrine of foreign jurists; and it stands approved by the judgment of the supreme court of New York in Watson v. Duykinck, 3 Johns. 335, and by the supreme court of Massachusetts in Griggs v. Austin, 3 Pick. 20. I am aware, that some of the English cases look the other way; and while they seem to admit the doctrine, fritter it away upon very nice distinctions.[4] This point, however, it is not necessary for me now to decide. But I specially refer to the case of Watson v. Duykinck, because, in delivering the opinion of the court, Mr. Chief Justice Kent treated the case in 2 Show. 283 (291), as of very little authority; and, although it is cited by Lord Tenterden (Abb. Shipp. pt. 4, p. 447, c. 2, § 4), it is dryly stated, without any auxiliary authority or comment

---

[3] See the opinions of foreign jurists, and especially of Cleirac, Valin, Pothier, Roccus, Straccha, and Loccenius, cited in note 1 to the American edition of Abbott on Shipping (1829; p. 277). See, also, 1 Valin, Comm. p. 661, and the authorities cited in 3 Johns. 339, 340.

[4] See, also, on this point, Mashiter v. Buller, 1 Camp. 84; Gillan v. Simpkins, 4 Camp. 241; Blakey v. Dixon, 2 Bos. & P. 321; Manfield v. Maitland, 4 Barn. & Ald. 582; De Silvale v. Kendall, 4 Maule & S. 37; Tasker v. Scott, 6 Taunt. 234; Andrew v. Moorhouse, 5 Taunt. 435. Most of these cases are very ably commented on by Mr. Chief Justice Parker in delivering the opinion of the court in Griggs v. Austin, 3 Pick. 20.

to support it. It is also cited in the same way by Mr. Chancellor Kent, in his Commentaries (volume 3 [3d Ed.] p. 191). It seems to me, that this case is at variance with the general law, which governs the claim of wages. That depends not at all upon the particular contract of the owner, as to the freight for the voyage but upon general principles. The contract of the owner respecting freight, is strictly res inter alios acta; of which the seamen are neither to take the disadvantages, nor the benefits, unless they are direct parties to its stipulations, and make their own rights dependent upon it. It might just as well be maintained, that, if the owner should insure the freight, the seamen would, in case of a total loss of freight, recover their wages, because he was indemnified thereby; and so in effect received freight. Yet we all know, that such a doctrine is wholly indefensible. See Abb. Shipp. pt. 4, c. 3, § 1, note 1 to American edition of 1829, and cases there cited.

A passage has also been cited from Mr. Chancellor Kent's Commentaries (volume 3, p. 192), in which, after referring to the doctrine, that wages are payable after a capture and condemnation, if there has been a final decree of restitution upon an appeal, and freight allowed in damages, he has added: "So in the case of shipwreck, if any proportion of freight be paid for the cargo saved, wages of seamen are to be paid in the same proportion." No authority is cited for this position; and from what has been already stated, as to wages in cases of shipwreck, it will be found difficult to reconcile it with the present admitted doctrine, that even if no freight is earned, the seamen are entitled to be paid their full wages out of the remnants of the ship. The foreign law, as we have seen, contemplates no reduction in the very case put by the learned chancellor. The case of Lewis v. The Elizabeth & Jane, 7 Am. Jur. 30, before the learned judge of the district court of Maine, has also been relied on at the argument by the defendant's counsel, to defeat the claim for full wages. I can find no sufficient warrant in that opinion to support the argument. The principal point there was, whether the seamen were entitled to their wages for the voyage, the vessel having been by them abandoned as a derelict at sea before the end of the voyage; and having been brought into port by other salvors, and restored on salvage to the owners of the vessel and cargo. The learned judge discussed that subject with great ability, and came to the conclusion, that the seamen were not entitled to their wages under such circumstances. I am not now called upon to express any opinion upon that question, although it must be said, that it is very difficult to resist the cogent reasoning by which his judgment is maintained. In that case he merely glances at the present question in some incidental suggestions, but nowhere affects to dispose of it. It seems to me, then,

that this question is fairly open to be decided upon principle and the analogies of the law, if indeed the silence already alluded to does not lead us to a direct conclusion. Upon principle and the analogies of the law (although at first I freely confess that I thought otherwise), I am satisfied that the seamen are entitled to their full wages, since more freight has been in fact received than is sufficient to pay them. Or, treating this as a case, like the tabula in maufragio, where one third only of the ship, cargo, and freight has been saved from the common shipwreck, the seamen's wages attach, as a privileged lien, to the relics of the ship and freight.

There are some other considerations, not unimportant in a case of this sort. In the first place, there is no hardship upon the owner in such a rule; for he may indemnify himself by insuring the ship and freight. In the next place, there would be great hardship on the other side in an opposite rule; for the policy of the law will not suffer the seamen to insure their wages. In the next place, the general principles of the contract of hire entitle the seamen to recover full wages for their services in all cases. There are exceptions created by the maritime law, which make them oftentimes dependent upon the fate of the ship and freight, upon the grounds of public policy. Freight must be earned in ordinary cases, to found the claim for wages. But it is by no means necessary, that it should be a full freight; or that the voyage should be beneficial to the owner. It is incumbent upon those, who insist upon the exception, as extending to the present case, to show, that it is the proper result of the policy, on which the exception is founded; or that some positive authority has established the rule, that the seamen must contribute from their wages pro rata for every partial loss of freight. Neither has been shown; or at least neither has been shown to my satisfaction. If the seamen's wages are nailed to the last plank of the ship, it seems to me, that they are also to the last fragment of the freight. In the former case it is a lien for the full wages for the voyage. In the latter it seems to me, that the same principle must govern. The case of Sheppard v. Taylor, 5 Pet. [30 U. S.] 675, treats the lien on a ship and freight as of the same nature, and ordinarily of the same extent. It would be strange, that the owner should be liable for the whole wages, if he received from the proceeds of the wreck of the ship sufficient to pay them; and yet, that he should be liable, as receiver of the freight, for one third only, although, the freight were of a far greater amount in value than the proceeds of the ship. It appears to me, that the true principle in cases of this sort is, that if any freight is saved, sufficient to pay the wages, it is bound to the full payment of them. I cannot also but deem, that public policy and the interests of commerce are best subserved by this course. For, if upon every partial

loss of freight in a voyage, the wages of seamen were to be reduced pro rata, it would operate a great discouragement upon seamen to remain by the ship, and to perform the voyage. If there should be a loss of half the freight they would lose half of their wages; and indeed would continue in the service of the ship in future for half pay. Such a consideration would tend to promote discontent, indifference in the discharge of duty, a disposition to desertion, and an unwillingness to encounter perils, all of which would be most mischievous to the substantial interests of the owner. These interests are best promoted by holding out a uniform, if not a high, premium for diligence, activity, enterprise, and gallantry in the service of the ship.

Upon the whole, my opinion is, that there ought to be a decree of full wages for the voyage. The decree of the district court is therefore affirmed, with interest and costs.

[NOTE. The case was again submitted to the court upon the question whether the whole wages are to be calculated from half the time after the arrival of the brig at the port of St. Petersburg, in Russia. The court answered in the affirmative. Case No. 11,186.]